### UNITED STATES  DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**BRUCE TAYLOR**                                              **CIVIL ACTION**

**versus**                                                          **NO. 06-2482**

**BURL CAIN, WARDEN**                                    **SECTION: "A" (3)**

### <u>REPORT AND RECOMMENDATION</u>

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Bruce Taylor, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On October 30, 2001, he was convicted of second degree murder in violation of La.Rev.Stat.Ann. § 14:30.1.[2]  On November 20, 2001, he was sentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[3]  On December 4, 2002, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[4]  The Louisiana Supreme Court denied his related writ applications on October 10, 2003.[5]

On July 6, 2004, petitioner filed with the state district court an application for post-conviction relief.[6]  That application was denied on July 16, 2004.[7]  He next filed with the Louisiana Fourth Circuit Court of Appeal an application for supervisory writs and/or review[8] which was denied

---

[2] State Rec., Vol. I of III, minute entry dated October 30, 2001; State Rec., Vol. I of III, jury verdict form.

[3] State Rec., Vol. I of III, transcript of November 20, 2001, p. 3; State Rec., Vol I of III, minute entry dated November 20, 2001.

[4] State v. Taylor, No. 2002-KA-0385 (La. App. 4th Cir. Dec. 4, 2002) (unpublished); State Rec., Vol. I of III.

[5] State v. Taylor, 855 So.2d 325 (La. 2003) (No. 2003-KO-0193); State v. Taylor, 855 So.2d 326 (La. 2003) (No. 2003-KH-0258); State Rec., Vol. I of III.

[6] State Rec., Vol. I of III.

[7] State Rec., Vol. I of III, Judgment dated July 16, 2004.

[8] State Rec., Vol. I of III.

on January 18, 2005.[9]  He then filed with the Louisiana Supreme Court an application for writ of review and mandamus[10] which was denied on January 27, 2006.[11]

On March 28, 2006, petitioner filed this federal application for *habeas corpus* relief.[12] In his application, petitioner asserts the following claims:

1.   There was insufficient evidence to support petitioner's conviction;

2.   Hearsay was wrongly admitted into evidence;

3.   The trial court erred in allowing the prosecution to impeach a witness based on her grand jury testimony;

4.   Petitioner's sentence is excessive; and

5.   Petitioner was indicted by a grand jury empaneled pursuant to an unconstitutional state law.

---

[9] State v. Taylor, No. 2004-K-2125 (La. App. 4th Cir. Jan. 18, 2005) (unpublished); State Rec., Vol. I of III.

[10]  Supplemental State Rec., Vol. I of I.

[11]  State *ex rel.* Taylor v. State, 922 So.2d 534 (La. 2006) (No. 2005-KH-0734); Supplemental State Rec., Vol. I of I.

[12]  Rec. Doc. 1.

The state originally took the position that petitioner's federal application was timely filed;[13] however, in a supplemental response, the state changed its position and argued that the application was untimely.[14]

<u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his conviction becomes "final."   Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).[15]

As noted, on October 10, 2003, the Louisiana Supreme Court denied petitioner's writ applications challenging the state intermediate appellate court's judgment affirming his conviction and sentence.  For AEDPA purposes, his conviction became "final" ninety (90) days later when his period expired for seeking a writ of certiorari from the United States Supreme Court.  <u>See</u> <u>Roberts v. Cockrell</u>, 319 F.3d 690, 694 (5th Cir. 2003); <u>Ott v. Johnson</u>, 192 F.3d 510, 513 (5th Cir. 1999); <u>Chester v. Cain</u>, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); <u>see also</u> U.S. Sup. Ct. R. 13(1).  Accordingly, petitioner's period for seeking federal *habeas corpus* relief commenced on January 8, 2004, and expired one year later, unless that deadline was extended through tolling.

---

[13]  Rec. Doc. 8, p. 1.

[14]  Rec. Doc. 11.

[15]  Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are inapplicable in the instant case.

-  4  -

The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  28 U.S.C. § 2244(d)(2).  One hundred seventy-nine (179) days of petitioner's one-year statute of limitations elapsed prior to being tolled by the filing of his state post-conviction application on July 6, 2004.  That application was denied on July 16, 2004; however, tolling continued until August 16, 2004, when petitioner's period expired for filing a writ application with the Louisiana Fourth Circuit Court of Appeals.  Melancon v. Kaylo, 259 F.3d 401, 406-07 (5th Cir. 2001).[16]  Another one hundred nineteen (119) days of the statute of limitations then elapsed before petitioner filed his untimely writ application with the Louisiana Fourth Circuit Court of Appeal on December 14, 2004.  At that point, the statute of limitations was again tolled and remained tolled until January 27, 2006, when the Louisiana Supreme Court denied the related writ application.  See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004).[17]

When the statute of limitations again started to run, a total of two hundred ninety-eight (298) days of the one-year period had elapsed, leaving sixty-seven (67) days remaining.

---

[16]  In Louisiana, a litigant has thirty days to file a writ application with an intermediate court of appeal.  See Louisiana Uniform Rules of the Courts of Appeal Rule 4-3; see also Melancon, 259 F.3d at 404.  In this case, the thirtieth day, August 15, 2004, was a Sunday; therefore, the period was extended until Monday, August 16, 2004.  See La.C.Cr.P. art. 13; La.Rev.Stat.Ann. § 1:55.

[17]  Grillette holds that tolling continues uninterrupted during the period of appellate review, so long as petitioner sought such review in a timely manner.  The state does not argue that the related Louisiana Supreme Court writ application was untimely, and the state court record does not conclusively establish that it was untimely.  Accordingly, this Court will assume for the purposes of this decision that it was timely filed.

Because petitioner's application was filed sixty (60) days later on March 28, 2006,[18] it was timely filed.

Because the federal application was timely filed, and because the state concedes that petitioner exhausted his state court remedies,[19] the Court will address his claims.

Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

---

[18]  Petitioner signed his federal *habeas corpus* application on March 28, 2006. Rec. Doc. 1. That date represents the earliest date that petitioner could have presented his application to prison officials for mailing and, therefore, the earliest date that this Court could deem his *habeas* petition to have been filed for statute of limitations purposes. Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).

[19]  Rec. Doc. 8, p. 2.

§ 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1); Hill, 210 F.3d at 485.

<u>Facts</u>

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

Defendant was charged with the second degree murder of Leroy Batiste.

New Orleans Police Officer Raymond Young responded to a shooting on the evening of May 14, 2001. Upon arrival at the scene on Old Gentilly Road, Officer Young observed the unresponsive victim lying on the ground bleeding.

Debra Batiste, the victim's mother, identified a photograph of the apartment at 6651 Old Gentilly Road where her daughter and the victim resided. She said a lot of people in the area picked on her son because he was a loner. Defendant lived in the same apartment complex as the victim. She said that some two weeks before he was murdered, defendant's brothers shot at the car in which the victim

- 7 -

was riding, striking him in the leg. Defendant's two brothers were arrested in connection with that shooting. Ms. Batiste said the animosity between the victim and defendant's brothers developed because one of defendant's brother's [sic] had borrowed the victim's screwdriver and the victim had asked for it back. That was the same week the victim was first shot and wounded.

New Orleans Police Detective Danny Wharton investigated the May 4, 2001 shooting of the victim in the leg. He arrested Anthony and Alfred Moliere in connection with that shooting. Det. Wharton said the Molieres were defendant's brothers.

Det. Fred Bates investigated the murder of the victim, responding to a call received at approximately 11:00 p.m. on May 14, 2001. The victim had been transported to Charity Hospital by the time the detective arrived at the scene. He noted that the victim's vehicle had three bullet holes in it from the earlier shooting incident. Seven .380 caliber cartridge casings, made by two different manufacturers, were recovered at the homicide scene. An eighth casing was discovered the next day.

Osborne Parker testified that he used to live around defendant. He had known him almost his entire life, but was not a close friend. Parker also knew the victim from the apartment complex, but was not a good friend and never hung out with him. On the night of the murder, Parker saw defendant sitting in his doorway. Parker was looking for Keyoka Riley, whom he referred to as his "sister," but who was not a blood relation. Parker asked defendant if he had seen her. Defendant replied that he had not seen her, and then said to Parker that "I'm just kind of messed up," "I'm just kind of fu---- up right now in the head."

Parker eventually found Ms. Riley, and they walked to a store across the highway. On the way back, he heard gunshots, and looked over to see someone standing over the victim shooting. Parker said the person shooting the victim was wearing the same clothing that he had just seen defendant wearing – black jeans and a dark shirt, with a bandanna around his neck. He admitted that he did not immediately recognize defendant, but he thought about it afterward, when defendant told him that he had been in the shower at the time of the shooting. The shooter ran through a cut in the apartment complex. Parker conceded that the shooter did not run directly to defendant's apartment, which he said was perhaps two apartment buildings away from the scene of the shooting. Parker said he went to his apartment immediately after the shooting to telephone the police, and proceeded to the scene and attempted to comfort the victim, who was still

- 8 -

conscious. Parker described how blood was coming out of the victim's mouth and he was twitching as if he was trying to talk.

Parker saw defendant approximately twenty minutes after the shooting. At that time defendant was wearing a white shirt and shorts, and related that he had been in the shower. Parker said that, considering what had happened with defendant's brothers, he thought defendant was lying. He felt that defendant's explanation about being in the shower seemed contrived. When Parker was asked why he came to testify, he explained that he called the police because everyone else was afraid to say anything. He emphasized that he had seen the victim on the ground dying, indicating that it greatly disturbed him and prompted his action. He said he got in touch with Det. Bates and said he had some information that might help. Parker said he did not have anything against defendant or the victim, and that he prayed and asked God whether he was doing the right thing. When asked if he saw the killer in the courtroom, Parker identified defendant.

Parker conceded on cross examination that he had testified that the shooter "basically" looked like defendant. He was asked whether the shooter he saw "basically" looked like defendant, looked "similar" to him, "could have been" him, or that "maybe" it was him Parker replied "[a]ll of that." Questioned further as to whether he meant not definitely, Parker said that he was saying it was him. Defense counsel pointed out that "basically" did not mean "it was him," to which defendant [sic] said "okay." Parker admitted that he gave his name to police when he called 911 immediately after the shooting, but conceded that he spoke to no officers at the scene, and told no one that defendant was the shooter. Parker admitted that he knew a lot of police officers. He did not recognize a detective named Det. Ernest Rome, but said that could have been the detective he asked about getting in touch with Det. Bates. He did not know that detective's name. Parker said he heard that Det. Bates had left business cards on doors around the apartment complex. Parker admitted that the district attorney's office gave him money for a "down payment" on a house, but later said it was $512 to rent a house. He vehemently denied that was why he got involved. He protested the suggestion that he was bribed for his testimony, saying that was why he did not want to get involved in the first place. Parker admitted that he was not in the house anymore, explaining that he lost it when he lost his job.

Parker testified on redirect examination that he did not contact Det. Bates immediately after the shooting because he did not want to

get involved and because he felt that police would solve the crime, considering the "feuding" between defendant's brothers and the victim. Parker said the district attorney's office placed him in a witness protection program and asked him to look for a house. He said when he moved out of the house the landlord was supposed to return the money to the district attorney's office. He replied in the negative when asked whether he made any money from the case.

It was stipulated that if Officer Kenneth Leary were called as a witness he would be qualified as an expert in the examination of firearms and would testify that the seven spent .380 cartridge casings all came from one gun, but not the gun that was seized from the victim's residence.

Bruce Moliere, defendant's father, testified that he lived at 6666 Chef Menteur Highway. He was in his room sleeping when the victim was shot, and said that as far as he knew defendant was at home in the shower. Mr. Moliere testified on cross examination that his wife woke him up, and he went outside to find defendant standing there "soaking wet." He did not otherwise know that defendant had been in the shower at the time of the shooting. Mr. Moliere, his wife, defendant, and defendant's brothers, Anthony and Alfred, lived in the apartment.

Linda Moliere, defendant's mother, testified that her sister knocked on her door to inform her that the victim had been shot. She said defendant was in the shower with his girlfriend, Phyeka Spencer. Mrs. Moliere knocked on the bathroom door and told defendant about the shooting. She said defendant and his girlfriend got out of the shower and went outside. Mrs. Moliere knew the Batistes only as people who lived across the street. She said she once signed a petition to remove the victim from the complex because he had shot at someone in the complex. Mrs. Moliere said Anthony and Alfred Moliere also were her sons, and that after the victim was killed they were released from jail. Mrs. Moliere conceded on cross examination that she did not know when defendant and his girlfriend got into the shower, or how long they had been in there at the time she knocked on the bathroom door.

Phyeka Spencer testified that defendant was her fiancé. They were in the shower at the Moliere apartment when Mrs. Moliere knocked on the door to tell them that someone had been killed. They got dressed and went outside. She never talked to police about the case, but contacted the district attorney's office. She was told by one prosecutor that he could not help her, that he was on the other side. Ms. Spencer was told she did not have to come to the grand jury, but

she went anyway.  She testified before the grand jury, and she told them the same thing she testified to at trial.  Ms. Spencer denied that she walked up to Det. Bates and tried to talk to him.  Ms. Spencer was confronted with her grand jury testimony in which she stated that she had seen "him," apparently referring to Det. Bates, that he was at the scene of the crime, and that when she went to talk to him he said he could not help her.  Ms. Spencer testified that she did not recall saying that before the grand jury.  She said she had no idea what time she and defendant took their shower that night.  Again, she was confronted with her grand jury testimony wherein she stated that it had been about nine-thirty.  She did not recall that testimony.  She said they were in the shower for two hours having sex, and replied in the affirmative when asked whether the shower was running the whole time.  When asked whether the water got cold, she said off and on.  She claimed that defendant was inside of the apartment from the time he got home from work until the time they went outside after the murder.  Ms. Spencer admitted calling defendant's mother from the courthouse when the grand jury was meeting to tell her that Osborne Parker was testifying.

Devin Scott testified that he knew both the victim and the defendant.  He and four friends were sitting on a car when they heard two gunshots.  He looked down the street to see a man standing over the victim shooting him.   Afterward, the man ran through an alleyway.  He said the man was wearing a red bandanna over his face.  He saw defendant outside, soaking wet, after everything happened.  Scott testified during cross examination that Osborne Parker was walking up the driveway from the store when the first shots rang out.  A woman told Parker to grab her baby.  Parker ran inside, and when Scott looked back, the man was standing over the victim shooting him.  Scott said that in addition to the red bandanna, the shooter was wearing all black or all dark clothing.

Keyoka Riley testified that she knew defendant from living in the Desire Project.  Osborne Parker was living with her on May 14, 2001, at her mother's apartment at 6654 Chef Menteur Highway.  Ms. Riley testified that on the night of the shooting, she and Parker had gone to the store.  On their way back home she heard shots.  Parker ran into their apartment, and he held the door open for her to bring in her daughter.  Ms. Riley said Parker entered before her.  She did not see anyone shooting.  She said on cross examination that she did not see what Parker saw.  She stated that she had asked Parker why he was going to testify against defendant, and he said something to the effect that he did not know, that he was just doing it.  She

indicated that she did not think it was a good idea for him to testify. She said on redirect examination that she did not see how Parker could have seen anything from where they were.  She said that if he did see somebody, he could not have seen exactly who it was because it was dark.  Parker never told her he saw defendant shoot the victim, she said, emphasizing that they talked about everything.

Osborne Parker testified on rebuttal that Keyoka Riley told him that she was going to testify for defendant because she did not want anything to happen to him, meaning Parker.[20]

<u>Sufficiency of the Evidence</u>

Petitioner claims that there was insufficient evidence to support his conviction.  The United States Fifth Circuit Court of Appeals has noted that claims of insufficient evidence are to be analyzed pursuant to the standard set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979):

> In considering challenges to the sufficiency of evidence in habeas proceedings, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

<u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001) (quoting <u>Jackson</u>, 443 U.S. at 319).  This Court may find the evidence sufficient even though the facts additionally support one or more reasonable hypotheses which are consistent with petitioner's claim of innocence.  <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1316 (5th Cir. 1992); <u>see also</u> <u>Gibson v. Collins</u>, 947 F.2d 780, 783 (5th Cir. 1991). "The <u>Jackson</u> inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'"  <u>Santellan</u>, 271 F.3d at 193 (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993)).

---

[20]  <u>State v. Taylor</u>, No. 2002-KA-0385, at pp. 1-9 (La. App. 4th Cir. Dec. 4, 2002) (unpublished); State Rec., Vol. I of III.

A sufficiency of the evidence argument presents a mixed question of law and fact. Taylor v. Day, Civil Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  Therefore, this Court must defer to the state court unless its decision regarding the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected petitioner's challenge to the sufficiency of the evidence, holding:

> In his first assignment of error, defendant argues that the evidence was insufficient to sustain his conviction.
>
> This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La. App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
>
>> In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La. App. 4 Cir. 1991).  However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime.  State v. Mussall, 523 So.2d 1305 (La. 1988).  The reviewing court must consider the record as a whole since that is what a rational trier of fact would do.  If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra.  "[A] reviwing court is not

- 13 -

called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La. 1992) at 1324.

In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La. 1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, *supra*, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La. 1987).

98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La. App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.

Defendant's argument is that the testimony of Osborne Parker is insufficient to convict him. Parker freely admitted that he did not see the shooter's face. However, Parker said that before the shooting he had seen defendant wearing black jeans and a dark shirt, with a bandanna around his neck, and that the shooter was wearing these same items of clothing. Devon Scott, one of defendant's witnesses, testified that the shooter was wearing black or all dark clothing and a red bandanna over his face.

When asked whether he immediately recognized defendant as the shooter – at the time of the shooting – Parker replied "not really." (Trial transcript, p. 83). He said he did not think about it until after the shooting, when defendant told him he had been in the shower at the time of the shooting. When asked on direct examination if the shooter and defendant had the same description, Parker replied "basically." Under cross examination, defendant agreed that "basically" meant that it might have been him. However, Parker also said under cross examination that he was saying that defendant was the shooter. When Parker was asked by the prosecutor whether he

- 14 -

saw the person who shot the victim in the courtroom that day, Parker identified defendant.

The evidence suggests that the victim was killed within a relatively short time after Parker saw and talked to defendant, when defendant was wearing the black pants, dark shirt and bandanna. Parker testified that it was approximately twenty minutes later after the shooting that he saw defendant in the white shirt and shorts. When asked whether he believed defendant when defendant told him that he had been in the shower, Parker replied in the negative, stating that he had just seen him twenty minutes before then.

Parker also testified that after first seeing defendant in the bandanna and dark clothing, he went on to find Ms. Riley, and they walked to a nearby store. Parker, as well as Ms. Riley, who testified for defendant, testified that they were on their way back from the store when they heard the first shots. Parker was asked how long he was at the store, and he said five or ten minutes, noting that it was close to the apartment complex. Parker said they were halfway up the driveway when he heard the shots. Devon Scott also testified that Parker was walking up a driveway from the store when the shots rang out.

Linda Moliere, defendant's mother, testified that her sister knocked on her door to inform her that the victim had been shot, and Mrs. Moliere then knocked on the bathroom door to inform defendant of the shooting. Defendant was supposedly in the shower with Phyeka Spencer, his girlfriend. Ms. Spencer testified that she and defendant had been in the shower "hours" when defendant's mother knocked on the door. She replied in the affirmative when asked whether the water had been running for "two hours."

It could reasonably be inferred from the evidence that defendant's girlfriend lied when she said that she and defendant had been in the shower two hours. One could conclude that defendant could not have been in the shower for two hours at the time his mother knocked on the door, because Parker had seen him and talked to him well within two hours, at which time defendant was wearing black/dark pants, a dark shirt and a bandanna, the same clothing both Parker and Devon Scott said the shooter was wearing. Although the timeline is unclear, it appears all but certain that two hours did not elapse between the time Parker talked to defendant before the shooting and the time Parker saw defendant outside after the shooting.

It cannot be questioned but that defendant had a motive to kill the victim. The victim had identified defendant's two brothers as

- 15 -

having shot him some ten days before he was murdered.  Those two presumably had been arrested based on the victim's identification of them, and were in jail.  They were released from jail after the victim was murdered.  There is no evidence that Osborne Parker harbored any animosity toward defendant or his family.

The testimony of Devon Scott and Keyoka Riley, Parker's "sister," conflicts with that of Parker in some important respects. Parker testified that he saw the shooter standing over the victim shooting, and saw the shooter run away.  Scott and Ms. Riley testified that Parker had gone inside before the last shots were fired.  Ms. Riley testified that she did not see how Parker could have seen anything, based on the distance alone, and that if he had, he could not have seen exactly who it was because it was dark.

Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could concluded [sic] from the evidence that a very short time before the shooting, defendant was seen wearing the same or virtually identical clothing as that worn by the shooter; that defendant's alibi witness, his girlfriend, lied when she testified that she and defendant had been in the shower for two hours, until after the shooting; that in fact defendant had not been in the shower at the time of the shooting; and that defendant had a motive for killing the victim.  The question arises as to whether it is a reasonable hypothesis of innocence that someone other than defendant, wearing identical or virtually identical clothing to the clothing he was wearing shortly before the shooting, shot and killed the victim and escaped into the night undetected, coincidentally providing a stroke of luck for defendant's brothers, who consequently escaped prosecution for their shooting of the victim ten days before he was killed.  The question also arises whether it is a reasonable hypothesis of innocence that Osborne Parker did not see defendant before the shooting, but either saw the shooter or learned what clothing the shooter had been wearing, and lied when he testified that he had seen defendant wearing similar clothing before the shooting.

Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that it was defendant who fatally shot Leroy Batiste.

There is no merit to this assignment of error.[21]

---

[21]  State v. Taylor, No. 2002-KA-0385, at pp. 9-13; State Rec., Vol. I of III.

In the instant case, petitioner does not argue that the prosecution failed to establish the elements of second degree murder; rather, he argues only that there was insufficient evidence to prove that *he* was the person who committed the crime.

This Court notes that the evidence against petitioner was far from overwhelming. Nevertheless, a federal court does not have the authority to overturn a state court conviction simply because it might have weighed the evidence differently or reached a different conclusion in the case. Indeed, under <u>Jackson</u>, a federal court "does not focus on whether the trier of fact made the *correct* guilt or innocence determination"; rather, the federal court looks only to whether the trier of fact "made a *rational* decision to convict or acquit." <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993) (emphasis added); <u>see also</u> <u>Santellan</u>, 271 F.3d at 193. Under that exacting standard, it simply cannot be said that the jurors acted *irrationally* in finding petitioner guilty when the evidence is viewed in the light most favorable to the prosecution.

In rejecting petitioner's challenge to the sufficiency of the evidence, the state court identified the proper standard, i.e. the <u>Jackson</u> standard, and applied it in a reasonable manner. Therefore, petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court rejects petitioner's claim challenging the sufficiency of the evidence.

<u>Hearsay Evidence/Rebuttal Argument</u>

Petitioner claims that hearsay was wrongly admitted into evidence and improperly referenced in the prosecution's rebuttal argument.

- 17 -

Petitioner's hearsay claim is based on the following exchange which occurred during the direct examination of Detective Bates:

> A.     ... I did receive a note saying that someone wanted to speak to me.  The person did not want to talk to me on the scene due to the fact that, again, this is a scatter site area where everybody knows everybody and to be seen talking to the police in some instances is not – not kosher in the neighborhood.  So I got in my vehicle, went approximately three to four blocks away from the area where I could not be seen, had a conversation with an individual and during this conversation, learned some information.   I took this information that I learned and from that information was able to develop a suspect.
>
> Q.     And Detective, as per this end of your investigation, what was the name of your suspect?
>
> A.     First name only was Bruce.  The description given was he is one of the brothers of the Molieres.[22]

On direct appeal, the Louisiana Fourth Circuit Court of Appeal found that the statement in question was in fact hearsay but denied relief based on a finding that the evidentiary error was ultimately harmless:

> In his second assignment of error, defendant avers that the trial court erred in admitting hearsay testimony, and in permitting the State to refer to that hearsay testimony in its rebuttal argument.
> Defendant refers to testimony by Det. Bates that when he returned to the crime scene the day after the murder, he was given a note by someone indicating that the individual wished to speak to him.  Det. Bates said he met with this person, and that developed defendant as a suspect based on information he received from that person.  Defense counsel had objected to the line of questioning at the outset on the ground of hearsay.  The objection was overruled by the trial court, which stated that the detective could explain that he

---

[22]   State Rec., Vol. I of III, transcript of October 29-30, 2001, pp. 50-51.

did something as a result of information received from another, but
could not tell the jury what anyone may have told him.  Defendant
admits that Det. Bates did not go into many specific details.

Hearsay is a statement, other than one made by the declarant
while testifying at the present trial or hearing, offered in evidence to
prove the truth of the matter asserted.  La. C.E. art. 801(C); State v.
Castleberry, 98-1388, p. 18 (La. 4/13/99), 758 So.2d 749; State v.
Raby, 98-1453, pp. 8-9 (La. App. 4 Cir. 6/2/99), 738 So.2d 699, 703.
Hearsay is not admissible except as otherwise provided by the Code
of Evidence or other legislation.  La. C.E. art. 802; State v.
Richardson, 97-1995, p. 13 (La. App. 4 Cir. 3/3/99), 729 So.2d 114,
121.

Defendant points to no specific statements by Det. Bates that
constitute hearsay, but cites two pages of his testimony in the trial
transcript.  Det. Bates' testimony that the note given to him stated
that someone wanted to speak to him and that the person did not want
to talk to him at the scene constituted hearsay.  However, this
information did not refer to defendant at all.  Det. Bates also testified
to the description of the suspect he received from that individual –
someone named "Bruce," who was a few years older than the victim,
and who was a brother of the Molieres.  This was hearsay.

Defense counsel did not specifically object to this testimony
by Det. Bates.  Even assuming that counsel's preemptive hearsay
objection at the outset of Det. Bates' testimony about his
development of defendant as a suspect was sufficient to preserve this
issue for review, the admission of hearsay was harmless error.  The
erroneous admission of hearsay evidence is subject to harmless error
review.  State v. Dangerfield, 2000-2359, p. 20 (La. App. 4 Cir.
4/3/02), 816 So.2d 885, 900.  The factors to be considered in
determining if the error was harmless include the following:  (1) the
importance of the witness' testimony in the prosecution's case; (2)
the presence or absence of evidence corroborating or contradicting
the witness' testimony on material points; (3) the extent of cross
examination permitted; and (4) the overall strength of the
prosecution's case.  Id.

As to the first factor, the prosecutor argued in rebuttal that
Det. Bates' development of defendant as a suspect corroborated
Osborne Parker's identification of defendant as the shooter.  The
prosecutor began this part of his rebuttal with the comment that Det.
Bates had spoken to three people before he even spoke to Osborne
Parker.  However, that was the only reference to Det. Bates speaking
to anyone, and the prosecutor did not specifically state in his rebuttal

that anyone gave information to Det. Bates, much less information that defendant killed the victim or was even involved. The prosecutor's rebuttal was that Det. Bates' investigation led him to focus on defendant as a suspect independent of anything Osborne Parker told him, not that other people had identified defendant as the shooter. It was not Det. Bates' hearsay that was the focus of the State's rebuttal, but the fact that Det. Bates had already developed defendant as a suspect before Osborne Parker came forward.

As to the second factor in the harmless error review for hearsay, the presence or absence of evidence corroborating or contradicting the witness' testimony on material points, Osborne Parker's testimony covered any hearsay references by Det. Bates. More importantly, the jury learned from the second and third witnesses to testify, the victim's mother and Det. Wharton, that defendant was the brother of two individuals who had been accused of shooting and wounding the victim only days before the victim was killed. The evidence clearly establishes that Det. Bates would have focused on defendant at some point as a possible suspect. As to the third factor, the defendant was afforded full cross examination of Det. Bates. As to the fourth factor, the State's case is weak. Nevertheless, considering Det. Bates' slight hearsay references, and the fact that the evidence established that defendant was a natural suspect, the admission of Det. Bates' hearsay testimony was harmless error.[23]

It is clear that the statement at issue was not only hearsay but was in fact hearsay of

the most pernicious sort. The Louisiana Supreme Court has noted:

Under La. Code Evid. art. 801, hearsay is defined as a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted therein. The content of an informant's tip may not be used at trial by a law enforcement officer because the testimony violates the accused's right to confront and cross-examine his accusers. State v. Hearold, 603 So.2d 731 (La. 1992).

Under certain circumstances, the testimony of a police officer may encompass information provided by another individual without constituting hearsay if offered to explain the course of police investigation and the steps leading to the defendant's arrest. State v.

_____

[23] State v. Taylor, No. 2002-KA-0385, at pp. 14-16; State Rec., Vol. I of III.

> Smith, 400 So.2d 587 (La. 1981); State v. Calloway, 324 So.2d 801
> (La. 1976); State v. Monk, 315 So.2d 727 (La. 1975).  However, the
> fact that an officer acted on information obtained from an informant
> may be relevant to explain his conduct, but it may not be used as a
> passkey to bring before the jury the substance of the out-of-court
> information that would otherwise be barred by the hearsay rule.  State
> v. Wille, 559 So.2d 1321 (La. 1990); Hearold, *supra*.

State v. Hawkins, 688 So.2d 473, 477 (La. 1997).  The Louisiana Supreme Court has further held:

> Absent some unique circumstances in which the explanation of
> purpose is probative evidence of a contested fact, such hearsay
> evidence should not be admitted under an "explanation" exception.
> The probative value of the mere fact that an out-of-court declaration
> was made is generally outweighed greatly by the likelihood that the
> jury will consider the statement for the truth of the matter asserted.

Hearold, 603 So.2d at 737.  The Louisiana Supreme Court has additionally noted:  "Admission of

information received by a police officer in the investigation of the crime, on the basis that such

information explains the officer's presence and conduct and therefore does not constitute hearsay

evidence, is an area of widespread abuse."  Wille, 559 So.2d at 1331.

Moreover, although federal *habeas* relief is not available to correct errors which

violate solely state evidence law,[24] petitioner's claim is broader in that it implicates his rights under

the federal Confrontation Clause.  However, the United States Fifth Circuit Court of Appeals has

held:

> Although the protections of the Confrontation Clause and the
> hearsay rule overlap, they are not co-extensive; the [Confrontation]
> Clause does not necessarily prohibit the admission of hearsay
> statements against a criminal defendant, even though the admission
> of such statements might be thought to violate the literal terms of the

---

[24] A federal *habeas* court "does not sit to review the mere admissibility of evidence under state
law."  Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).

Clause.  The wrongful admission of hearsay evidence violates the Confrontation Clause only when the evidence was a crucial, critical or highly significant factor in the framework of the whole trial.  In making this determination, we consider five general factors derived from the Supreme Court's opinion in <u>Dutton v. Evans</u>, 400 U.S. 74, 87, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970):

> (1) whether the hearsay evidence was crucial or devastating;
> (2) whether prosecutors misused a confession or otherwise engaged in misconduct;
> (3) whether a joint trial or the wholesale denial of cross-examination was involved;
> (4) whether the most important prosecution witness, as well as other prosecution witnesses, was available for cross-examination; and
> (5) the degree to which the hearsay evidence is supported by indicia of [its] reliability.

<u>Gochicoa v. Johnson</u>, 118 F.3d 440, 446 (5th Cir. 1997) (quotation marks and citations omitted).  The

Fifth Circuit continued:

> The determination of whether evidence is "crucial" or "devastating" ... recognizes that the erroneous admission of unreliable hearsay evidence may nonetheless be harmless in light of other evidence at trial; by examining whether hearsay was "crucial" or "devastating," the court seeks to determine whether the impermissible hearsay was sufficiently damaging to the defense to warrant reversal.

<u>Id</u>. at 447.  The Fifth Circuit has similarly noted:

> [V]iolations of the Confrontation Clause are still subject to harmless error analysis. ... To determine whether the error was harmless, we consider the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.

<u>Hafdahl v. Johnson</u>, 251 F.3d 528, 539-40 (5th Cir. 2001) (quotation marks omitted).

It is evident that the Confrontation Clause was implicated by the admission of the hearsay statement in the instant case.  The statement clearly implied that the unidentified person told Bates that the shooter was a person named Bruce who was a brother of the Molieres.  That description fits a single person, i.e. the instant petitioner, Bruce Taylor, the brother of Anthony and Alfred Moliere.  Accordingly, the jurors could fairly conclude that the unknown person identified petitioner as the killer.  In this case, petitioner was deprived of the opportunity to confront that unnamed accuser and test the basis of his or her knowledge.

As noted, the state courts found that the admission of the hearsay statement in this case was ultimately harmless.  That conclusion is not unassailable.  Only one witness, Osborne Parker, identified petitioner as the killer, and Parker's identification was equivocal at best. Moreover, while petitioner clearly had a motive for the shooting, no physical evidence in fact linked him to the crime.  Additionally, while the testimony of his main alibi witness, Phyeka Spencer, is of questionable veracity, the fact that Spencer may have lied or embellished the truth is of little moment in that innocent persons with no convincing alibi may in some instances try to concoct one out of fear of being wrongly convicted.  In this case, even if petitioner was *not* in the shower at the time of the shooting, that does not mean that he committed this murder.

That said, this Court is mindful that it must review this claim under the exacting standards imposed by the AEDPA.  "Whether admission of hearsay evidence violated a defendant's Sixth Amendment right of confrontation is a mixed question of law and fact ...."  Gochicoa, 118 F.3d at 445.  Therefore, relief can be granted on this claim only if petitioner demonstrates that the state court decision was contrary to, or involved an unreasonable application of, clearly established

federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  The

Court finds that petitioner has not made that showing.  While the hearsay statement at issue may

have been *a* factor in the jury's decision, the Court simply cannot conclude that it was "a crucial,

critical or highly significant factor in the framework of the whole trial."  Gochicoa, 118 F.3d at 446.

To the extent that petitioner is asserting an independent claim that the reference in

the rebuttal argument to the hearsay evidence violated his federal constitutional rights, the Court

finds that claim to be clearly without merit.  On direct appeal, the Louisiana Fourth Circuit Court

of Appeal rejected that claim, holding:

> As to the prosecutor's reference to the hearsay during the rebuttal argument, other than the prosecutor's reference to Det. Bates talking to three people, implying, perhaps, that the detective received information from them, the rebuttal was proper.  The trial court did not err in permitting the prosecutor to point out to the jury that Det. Bates developed defendant as a suspect prior to Osborne Parker coming forward.  A conviction generally will not be reversed for improper closing argument unless the court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. State v. Cousin, 96-2973, p. 16 (La. 4/14/98), 710 So.2d 1065, 1073 (prosecutor's closing argument directly referring to hearsay evidence amounting to a confession by the defendant not harmless error).  The prosecutor's reference to Det. Bates talking to three people, even assuming it was a reference to hearsay, when viewed in the context of Det. Bates' development of defendant as a suspect, when considered in light of the circumstances previously discussed, does not rise to the level of reversible error.
> 
> The... prosecutor's obtuse reference to [the hearsay] in rebuttal argument was harmless error.[25]

The United States Fifth Circuit Court of Appeals has held:

---

[25]  State v. Taylor, No. 2002-KA-0385, at pp. 16-17; State Rec., Vol. I of III.

> Even if ... [a] prosecutor's remarks [are] improper, prosecutorial remarks are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair. Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.

Harris v. Cockrell, 313 F.3d 238, 245 (5th Cir. 2002) (internal quotation marks, ellipsis, and footnote omitted); see also Jones v. Butler, 864 F.2d 348 (5th Cir. 1989).  In other words, a prosecutor's remarks warrant *habeas* relief only if they were "a crucial, critical, highly significant factor upon which the jury based its verdict."  Harris, 313 F.3d at 245.

In the instant case, even if the comments were improper, petitioner is not entitled to relief under that high standard.  The prosecutor's comments were neither persistent nor pronounced.  Moreover, although the prosecution's case was admittedly weak, it was not so insubstantial that the comments can be said to have played any role in the resulting conviction.  The remarks simply cannot be considered a "crucial, critical, highly significant factor" in the jury's verdict and, therefore, did not render petitioner's trial fundamentally unfair.

## Witness Impeachment

Petitioner claims that the trial court erred in allowing the prosecution to impeach a witness based on her grand jury testimony.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected that claim, holding:

> In this assignment of error, defendant claims that the trial court erred in permitting the prosecutor to impeach defendant's girlfriend, Phyeka Spencer, with her grand jury testimony.  The prosecutor confronted Ms. Riley [sic] with her grand jury testimony that on the night of the homicide she and defendant got into the shower at 9:30 p.m., testimony she said she did not remember giving.

Ms. Spencer also was confronted with her grand jury testimony in which she stated that she had seen "him," apparently referring to Det. Bates, that he was at the scene of the crime, and that when she went to talk to him he said he could not help her. She had testified at trial that she did not talk to Det. Bates at the scene. The trial court overruled defendant's objections to the use of the grand jury testimony.

La. Const. Art. 5, § 34(A), relating to the establishment of parish grand juries, mandates that the secrecy of grand jury proceedings be provided by law. La. C.Cr.P. art. 433 specifies who may be present during grand jury sessions. La. C.Cr.P. art. 434 mandates that members of the grand jury, all other persons present at grand jury sessions, and all persons having confidential access to information concerning grand jury proceedings shall keep secret the testimony of grand jury witnesses, under penalty of contempt. La. C.Cr.P. art. 434 sets forth two exceptions: (1) after the indictment, such persons may reveal statutory irregularities to defense counsel, the attorney general, the district attorney, or the court, and may testify concerning them; and (2) such persons may disclose grand jury testimony to show that a witness committed perjury in her testimony before the grand jury. A third exception was established by the court in State v. Peters, 406 So.2d 189 (La. 1981), where the court held that a prosecutor must disclose to the defendant any grand jury testimony constituting material exculpatory evidence as per Brady v. Maryland. [FN]

> [FN] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,
> 10 L.Ed.2d 215 (1963).

Under La. R.S. 14:124, generally, it shall constitute perjury whenever any person testifies as a witness before the grand jury to a material fact and later testifies contradictorily to or inconsistently with that prior statement. However, in State v. Terrebonne, 236 So.2d 773 (La. 1970), the court held that the exception in La. C.Cr.P. art. 434 allowing the use of grand jury testimony to show that a witness committed perjury applies to situations where the witness is actually being prosecuted for the crime of perjury. The court held in Terrebonne that the exception does not mean that the State can use the record of the grand jury proceeding to impeach a witness during trial of the defendant indicted pursuant to that grand jury proceeding. In State v. Ivy, 307 So.2d 587 (La. 1975), the court reiterated its holding in Terrebonne, but held that the State's use of grand jury

testimony to cross examine a defense witness was harmless error.
The court found that the evidence of guilt – eyewitness testimony of
three individuals – was overwhelming, while the State's use of the
grand jury testimony was limited to cross examination of only one
witness, the daughter of the defendant.  Accord State v. Bush, 91-
0150 (La. App. 4 Cir. 3/15/94), 634 So.2d 79 (citing Terrebonne and
Ivy for the proposition that the testimony of a witness before a grand
jury is inadmissible at trial to prove a witness' prior inconsistent
statement).

In State v. Poland, 2000-0453, pp. 6-7 (La. 3/16/01), 782
So.2d 556, 559-560, the court cited two of its prior decisions to set
forth the purposes underlying the grand jury secrecy requirement,
stating:

> In State v. Revere, 232 La. 184, 194-95, 94
> So.2d 25, 29 (1957), this court discussed the need for
> secrecy in grand jury proceedings:
>
>> Not only has the grand jury
>> been, traditionally, an inquisitorial
>> body charged with determining
>> whether probable grounds for
>> suspicion of a crime exists, but, from
>> its very beginning, its sessions have
>> been surrounded by a cloak of
>> seclusion and secrecy that has been
>> jealously guarded and preserved
>> during the intervening centuries as the
>> only means of insuring that it be
>> permitted the freedom of action
>> necessary for a vigorous and effective
>> discharge of its duties.  The reasons
>> underlying this necessity for secrecy
>> are manifold.  Among them are: (1) It
>> promotes freedom in the disclosure of
>> crime; (2) prevents coercion of grand
>> jurors through outside influence and
>> intimidation and thus permits a
>> freedom of deliberation and opinion
>> otherwise impossible; (3) protects the
>> safety and freedom of witnesses and
>> permits the greatest possible latitude

- 27 -

in their voluntary testimony; (4) prevents perjury by all persons appearing before the grand jury; (5) prevents the subornation of perjury by withholding facts that, if known, the accused or his confederates might attempt to disprove by false evidence and testimony; (6) avoids the danger of the accused escaping and eluding arrest before the indictment can be returned; and (7) keeps the good names of the persons considered, but not indicted, from being besmirched. Thus it may be seen that the secrecy that has from time immemorial surrounded the grand jury sessions is not only for the protection of the jurors and the witnesses, but for the state, the accused, and, as has been said, for the society as a whole.

In In re Grand Jury, 98-2277 (La. 4/13/99), 737 So.2d 1 6, this court, quoting Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218-219, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979), elaborated further on the need for secrecy of grand jury proceedings:

We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings. In particular, we have noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings. First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of their testimony. Moreover, witnesses who appeared before the

- 28 -

grand jury would be less likely to
testify fully and frankly, as they would
be open to retribution as well as to
inducements.  There also would be the
risk that those about to be indicted
would flee, or would try to influence
individual grand jurors to vote against
indictment.  Finally, by preserving the
secrecy of the proceedings, we assure
that persons who are accused but
exonerated by the grand jury will not
be held up to public ridicule.  For all
these reasons, courts have been
reluctant to lift unnecessarily the veil
of secrecy from the grand jury.

2000-0453, pp. 6-7, 782 So.2d at 559-560.

In the instant case, the State's use of the grand jury testimony
falls under no recognized exception.  Therefore, the trial court erred
in overruling defendant's objections to the use of that grand jury
testimony.  However, like in Ivy, the State made very limited use of
the grand jury proceedings in the instant case, using two excerpts
from the testimony of one witness in the cross examination of that
witness at trial.  Unlike in Ivy, however, the evidence against
defendant in the instant case cannot be considered overwhelming.
Nonetheless, none of the reasons for maintaining secrecy of grand
jury proceedings is applicable in the instant case.  Under these
circumstances, it cannot be said that the ends of justice, including the
promotion of the goals underlying the grand jury secrecy rule, would
be served by reversing defendant's conviction on this ground.

There is no reversible error here.[26]

If the state laws regarding grand jury proceedings were violated, as the state court

found, that is indeed troubling.  Nevertheless, in these federal proceedings, such an error is

ultimately of no moment.  Federal *habeas corpus* relief may be granted only to remedy violations

---

[26] State v. Taylor, No. 2002-KA-0385, at pp. 17-21; State Rec., Vol. I of III.

of *federal* law; mere violations of *state* law will not suffice.  28 U.S.C. § 2254; Engle v. Isaac, 456

U.S. 107, 119 (1983).  This claim simply presents no federal issue.

Excessive Sentence

Petitioner claims that his life sentence is excessive.  On direct appeal, the Louisiana

Fourth Circuit Court of Appeal rejected that claim, holding:

> In his last assignment of error, defendant argues that the trial court imposed the mandatory life sentence without inquiring into any possible mitigating factors and failed to order a presentencing investigation report, the latter being one of the grounds asserted in defendant's motion to reconsider sentence, which the trial court denied.  Defendant prays that the matter be remanded for a presentence investigation report and the re-evaluation of his motion for reconsideration of sentence.  Defendant does not directly assert that his sentence was excessive.
>
> The ordering of a presentence investigation report is discretionary with the trial court.  La. C.Cr.P. art. 875(A)(1) ("the court may order ... a presentence investigation.");  State v. Hayden, 98-2768, p. 27 (La. App. 4 Cir. 5/17/00), 767 So.2d 732, 748.  A trial court's failure to order a PSI will not be reversed absent an abuse of discretion.   Hayden, 98-2768, p. 28, 767 So.2d at 748-749.  Defendant fails to show the trial court abused its discretion in failing to order a presentence investigation for a person facing a mandatory life sentence for the second degreed [sic] murder of a witness to prevent that witness from testifying against defendant's two brothers.
>
> La. Const. art. I, § 20 explicitly prohibits excessive sentences.  State v. Baxley, 94-2982, p. 4, (La. 5/22/95), 656 So.2d 973, 977.  Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment.  State v. Brady, 97-1095, p. 17 (La. App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272, rehearing granted on other grounds, (La. App. 4 Cir. 3/16/99).  However, the penalties provided by he legislature reflect the degree to which criminal conduct is an affront to society.  Baxley, 94-2984 at p. 10, 656 So.2d at 979.  A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime.  State v. Johnson, 97-1906, pp. 6-7 (La.

- 30 -

3/4/98), 709 So.2d 672, 677.  A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.  Baxley, 94-2984 at p. 9, 656 So.2d at 979; State v. Hills, 98-0507, p. 5 (La. App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217.

       In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately considered the mitigating and aggravating factors in La. C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record.  State v. Trepagnier, 97-2427, p. 11 (La. App. 4 Cir. 9/15/99), 744 So.2d 181, 189; State v. Robinson, 98-1606, p. 12 (La. App. 4 Cir. 8/11/99), 744 So.2d 119, 127.

       However, the underlying purpose of La. C.Cr.P. art. 894.1 is to provide an explanation for a particular sentence in those cases where the trial court is given discretion to choose a sentence tailored to the offender's circumstances from within a legislatively-provided sentencing range; when the trial court does not have to choose a sentence from within a given range, it complies with La. C.Cr.P. art. 894.1 when it informs the defendant he is receiving the statutorily mandated sentence.  State v. Washington, 99-1111, p. 26 (La. App. 4 Cir. 3/21/01), 788 So.2d 477, 497, writ denied, 2001-1096 (La. 5/13/02), 816 So.2d 866; State v. Burns, 97-1553, p. 7 (La. App. 4 Cir. 11/10/98), 623 So.2d 1013, 1018.

       In the instant case, the trial court informed defendant that it was imposing the only sentence available for it to impose – life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.  Accordingly, the trial court effectively complied with La. C.Cr.P. art. 894.1.  As to the issue of excessiveness, defendant points to no mitigating factors that would have justified the trial court imposing anything other than the mandatory life sentence.  Defendant points to no prior decision by a Louisiana appellate court, or the Louisiana Supreme Court, holding that a mandatory life sentence imposed on a defendant convicted of second degree murder was constitutionally excessive.

       There is no merit to this assignment of error.[27]

       To the extent petitioner is arguing that his sentence is excessive or otherwise inappropriate under Louisiana law, that claim is not cognizable in this federal proceeding.  Federal

---

[27] State v. Taylor, No. 2002-KA-0385, at pp. 21-23; State Rec., Vol. I of III.

*habeas corpus* relief is available only for violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law.  Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998).  Accordingly, this Court will not review the state court's findings regarding the constitutionality of petitioner's sentence under state law.

Further, to the extent that petitioner is claiming that his sentence is excessive under the Eighth Amendment of the United States Constitution, his claim is without merit.  In Solem v. Helm, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts."  United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997) (citing Rummel v. Estelle, 445 U.S. 263, 274-76 (1980)).  "[C]ourts must grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes."  Gonzales, 121 F.3d at 942 (quotation marks omitted).  "[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare."  Id.  (quotation marks omitted).

Interpreting Solem in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence.  Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar

crimes in the same jurisdiction and (2) sentences for the same crime
in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992).

The Fifth Circuit has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes

a benchmark for disproportionate punishment under the Eighth Amendment." Gonzales, 121 F.3d

at 943.  In Rummel, the Supreme Court upheld a petitioner's sentence to life imprisonment for

obtaining $120.75 under false pretenses.  The sentence was imposed under a Texas recidivist statute

and took into account petitioner's prior convictions for fraudulent use of a credit card and passing

a forged check.  The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences
> and grossly disproportionate punishments is an inherently subjective
> judgment, defying bright lines and neutral principles of law.
> Nevertheless, we can say with certainty that the life sentence
> approved in Rummel falls on the constitutional side of the line,
> thereby providing a litmus test for claims of disproportionate
> punishment in violation of the Eighth Amendment.

Gonzales, 121 F.3d at 943 (footnote omitted).

In light of the Rummel finding that a life sentence was not excessive when imposed

for a *nonviolent* offense where the habitual offender had two prior *nonviolent* offenses, all of which

were relatively minor offenses, this Court cannot conclude that petitioner's life sentence for the

grave crime of second degree murder is grossly disproportionate.  In that the sentence is not grossly

disproportionate, this Court's "inquiry is finished." Gonzales, 121 F.3d at 942.  Because petitioner's

sentence is not so excessive as to violate the United States Constitution, this claim must fail.

Grand Jury Claims

Lastly, petitioner presents two claims that he was indicted by a grand jury empaneled pursuant to an unconstitutional state law.  When petitioner asserted these claims in his post-conviction proceedings, the state district court rejected them on procedural grounds, holding:

> Mr. Taylor contends that his conviction should be vacated due to the recent findings in State v. Dilosa.  For the reasons discussed below, this Court disagrees with his assertions.
>
> Bruce Taylor was convicted, by a jury of his peers, of second degree murder.  He was subsequently sentenced to life imprisonment, without benefits.  On December 12, 2002, The Fourth Circuit Court of Appeals affirmed the conviction and sentence, and the Louisiana State Supreme Court denied writs on December 9, 2003.
>
> Petitioner's claim of grand jury discrimination is barred because no motion to quash was filed prior to the conviction being obtained.  This very issue was decided by the Louisiana Supreme Court in Deloach v. Whitley, 96-1901, (La. 11/22/96); 684 So.2d 349.  Therein, the Court pointed out that equal protection claims arising from grand jury composition are only preserved for review if a pre-trial motion to quash was filed.  See also Francis v. Henderson, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).
>
> For these reasons, the application for post-conviction relief and the motion in arrest of judgment is DENIED.[28]

The Louisiana Fourth Circuit Court of Appeal found "no error" in that judgment,[29] and the Louisiana Supreme Court denied the related writ application without assigning reasons.[30]

---

[28]  State Rec., Vol. I of III, Judgment dated July 16, 2004.

[29]  State v. Taylor, No. 2004-K-2125 (La. App. 4th Cir. Jan. 18, 2005) (unpublished); State Rec., Vol. I of III.

[30]  State ex rel. Taylor v. State, 922 So.2d 534 (La. 2006) (No. 2005-KH-0734); Supplemental State Rec., Vol. I of I.

The state argues that the claims are procedurally barred in this federal proceeding.

Regarding procedural bars, the United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.  This rule applies to state court judgments on both substantive and procedural grounds.  Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

As noted, in the last reasoned state court judgment addressing petitioner's grand jury claims, the state district court denied the claims based on Louisiana's rule that a challenge to an indictment is waived if not raised in a pretrial motion to quash.  It is clear that Louisiana's rule that grand jury challenges are waived unless presented in a pretrial motion to quash is an independent and adequate state ground so as to support the application of a procedural bar.  See, e.g., Williams v. Cain, 125 F.3d 269, 274-76 (5th Cir. 1997).

"When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice."  Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999).  In the instant case, petitioner can demonstrate neither.

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted) (emphasis in original). Objective factors that can constitute cause include interference by officials that makes compliance with the state procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel, and ineffective assistance of counsel. Romero v. Collins, 961 F.2d 1181, 1183 (5th Cir. 1992). In his federal application, petitioner makes no attempt whatsoever to establish cause for the procedural default. "Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

Further, petitioner has not shown that application of the bar will result in a fundamental miscarriage of justice. In order to establish a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted). The United States Fifth Circuit Court of Appeals has held:

> To demonstrate actual innocence, it is necessary that the petitioner show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt ... in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongfully excluded or to have become available only after trial.

Lucas v. Johnson, 132 F.3d 1069, 1077 (5th Cir. 1998) (quotation marks and citations omitted). Applying that standard, the Court finds that petitioner has not made a persuasive showing that he

- 36 -

is actually innocent of the charges against him.  Therefore, he cannot demonstrate that any

miscarriage of justice will result from application of the procedural bar.  Accordingly, petitioner's

grand jury claims are procedurally barred in this federal proceeding.

Second, even if the claims were not procedurally barred, petitioner could not be

granted relief in this proceeding based on those claims.  As the state district court noted, petitioner's

claims are based on <u>State v. Dilosa</u>, 848 So.2d 546 (La. 2003), in which the Louisiana Supreme

Court held that Louisiana laws which established a unique method for the selection of the grand jury

venire and foreperson in Orleans Parish violated La.Const. art. III, § 12(A), which prohibits the

passage of local laws concerning criminal actions.  However, the fact that those provisions violated

the *state* constitution is of no moment in a federal proceeding.  As previously noted, federal *habeas*

*corpus* relief may be granted only to remedy violations of the Constitution and laws of the United

States; mere violations of state law will not suffice.  28 U.S.C. § 2254; <u>Engle v. Isaac</u>, 456 U.S. 107,

119 (1983).[31]

---

[31]  Moreover, the Court notes that petitioner's claims have no merit even under state law based
on <u>State v. Harris</u>, 892 So.2d 1238 (La.) (unpublished appendix available on Westlaw), <u>cert. denied</u>,
126 S.Ct. 102 (2005), in which the Louisiana Supreme Court held:

> The defendant urges that his indictment should have been quashed as it was issued
> by an unconstitutionally selected grand jury, grand jury foreperson, and grand jury
> venire, relying on <u>State v. Dilosa</u>, 02-2222 (La. 6/27/03), 848 So.2d 546.  In <u>Dilosa</u>,
> this Court struck down as unconstitutional La.C.Cr.P. art. 412 and La. R.S. 15:114
> in their entirety, the introductory phrases of La.C.Cr.P. arts. 413(B) and 414(B) and
> La.C.Cr.P. arts. 413(C) and 414(C) in their entirety.  The offending provisions
> together provided procedures, applicable only in Orleans Parish, for the selection of
> the grand jury venire, the impaneling of the grand jury, selection of the grand jury
> foreman, the time for impaneling grand juries and the period of service, and the
> rotation of the judges who select and control the grand jury.  This Court found the
> provisions were "local laws" concerning "criminal actions" which regulated the

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus*

relief filed by Bruce Taylor be **DISMISSED WITH PREJUDICE**.

---

"practice" of Orleans Parish criminal courts in violation of La. Const. art. III, § 12(A)(3).

In this case, the grand jury that indicted the defendant in October of 1993 and the foreman of that grand jury, were selected while the applicable procedures declared unconstitutional in Dilosa were all in effect. However, the record reflects, and appellate counsel in brief concedes, that no motion to quash the indictment was ever filed in this case. A criminal defendant must assert a due process or equal protection claim regarding the selection and composition of a grand jury in a motion to quash filed prior to trial or waive any complaint in that regard. Deloch v. Whitley, 96-1901 p. 2 (La.11/22/96), 684 So.2d 349, 350. The defendant, thus, has waived review of this issue by his failure to file a pretrial motion to quash the indictment.

Even if the claim was not procedurally defaulted, the defendant is not entitled to relief. The statute and codal provisions in Dilosa were declared unconstitutional solely because they were local laws in violation of the state constitution, La. Const. art. III, § 12(A). "The constitutional prohibition against local laws which underlies the Dilosa decision simply reflects a policy decision that legislative resources and attention should be concentrated upon matters of general interest and that purely local matters should be left to local governing authorities." State v. Williams, 2003-0091 p. 3 (La. App. 4 Cir. 1/14/04), 866 So.2d 296, 298, writ denied, 2004- 0438 (La. 6/25/04), 876 So.2d 831, citing Morial v. Smith & Wesson Corp., 2000-1132 p. 22 (La.4/3/01), 785 So.2d 1, 17, cert. denied, 534 U.S. 951, 122 S.Ct. 346, 151 L.Ed.2d 262 (2001); Kimball v. Allstate Ins. Co., 97- 2885 p. 4 (La. 4/14/98), 712 So.2d 46, 50. Thus, "the substantial rights of a criminal defendant are not affected *per se* solely because he is indicted by a grand jury selected pursuant to local laws passed by the Louisiana State legislature." Id. Where a criminal defendant fails to show that his substantial rights were affected, he is not entitled to relief. Id.; State v. Rhea, 2004-0091 p. 7 (La. App. 4 Cir. 5/19/04), 876 So.2d 131, 135, writ denied, 2004-0901 (La. 10/1/04), 883 So.2d 1005; State v. Newman, 2003-1721 p. 16 (La. App. 4 Cir. 7/7/04), 879 So.2d 870, 880; see also State v. Mercadel, 2003-3015 p. 8 (La.5/25/04), 874 So.2d 829, 834 (a person can challenge the constitutionality of a statute only if the statute seriously affects his or her rights). The defendant has made no showing that his substantial rights were effected; thus, this assignment of error lacks merit.

Harris, 892 So.2d 1238, unpublished appendix at **3-4 (footnotes omitted) (available on Westlaw).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ninth day of April, 2007.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**